993 A.2d 626

**Kelroy WILLIAMSON**

v.

**STATE of Maryland.**

**No. 61 Sept.Term, 2009.**

Court of Appeals of Maryland.

April 22, 2010.

522

Bradford C. Peabody, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore, MD), on brief for Appellant.

Daniel J. Jawor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief for Appellee.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, Judge.

The writers for the NBC television series Law & Order Special Victims Unit would be hard pressed to author an episode full of more issues involving DNA than found in this case in which the Anne Arundel County police, in 2006, matched DNA of the Appellant, Kelroy Williamson, retrieved from his discarded McDonald's cup to the DNA found in two separate rape victims' forensic medical examinations in 1994 and 2002. Williamson was convicted by a jury in the Circuit Court for Anne Arundel County in 2007 on charges of rape and related offenses [1] for the 2002 crime, and he appealed to the Court of Special Appeals, arguing that his arrest warrant for the 2002 rape was based on a statement of probable cause predicated upon the illegal testing of the DNA from the discarded cup and the 1994 forensic examination, as well as

---

[1]. Kelroy Williamson was convicted of rape in the first and second degrees, sex offense in the first and second degrees, unnatural and perverted sexual practice, assault in the first and second degrees, and reckless endangerment. He was sentenced to two consecutive life sentences for first-degree rape and first-degree sexual offense.

the uploading of his DNA profile into a local database and search of that database for a profile match. His challenges are premised in the Maryland DNA Collection Act[2] and the Fourth Amendment to the United States Constitution,[3] and he seeks review of the trial judge's denial of his motion to suppress the obtaining and testing of the 2006 DNA sample and his statement to police as the poisonous fruits of an illegal arrest. We granted certiorari, *Williamson v. State*, 409 Md. 47, 972 A.2d 861 (2009), prior to any proceedings in the Court of Special Appeals, to consider the following question:

> Was it error to deny the motion to suppress evidence obtained in violation of Appellant's statutory and Fourth Amendment rights?

We hold it was not error to deny the motion to suppress the DNA evidence obtained in 2006 or the Appellant's statement to police, and we affirm the Circuit Court judge's dismissal of the motion to suppress.

## FACTS AND PROCEDURAL HISTORY

In setting forth the facts, we adopt a timeline suggested by the State in its brief, although we have provided our own recitation of events:

### 1994

In an unrelated case, an acquaintance of Williamson told the police that Williamson had raped her. She underwent a forensic medical examination, and vaginal swabs were collected but not tested for the presence of the assailant's deoxyribo-

---

**2.** The Maryland DNA Collection Act is found in Sections 2–501 to 2–512 of the Public Safety Article, Maryland Code (2003). Chapter 337 of the Maryland Laws of 2008 revised the Act and took effect on January 1, 2009. All citations herein refer to the 2003 version of the Act, which was in effect during the period in which Williamson alleges that the State violated the Act.

**3.** The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

nucleic acid (DNA). Williamson was arrested for the offense, but he claimed that the sexual intercourse was consensual. He ultimately entered an *Alford* plea [4] to battery.

### September 21, 2002

Eight years later, a different complainant alleged that she was raped by an unknown assailant. Vaginal swabs containing a DNA sample [5] were recovered during her forensic medical examination, and the sample, as tested by the Anne Arundel County Police Crime Lab, yielded a DNA profile of the assailant. The DNA profile was uploaded to the statewide DNA database system,[6] thereby creating a DNA record.[7] The DNA record was then uploaded to the Federal Bureau of Investigation's "Combined DNA Index System" or "CODIS." [8]

---

**4.** We have defined an *Alford* plea, derived from the Supreme Court case of *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), as "a guilty plea containing a protestation of innocence." *See Marshall v. State*, 346 Md. 186, 189 n. 2, 695 A.2d 184, 185 n. 2 (1997), citing *Pennington v. State*, 308 Md. 727, 728 n. 1, 521 A.2d 1216, 1216 n. 1 (1987); *see also* Rule 4–242(c) (court may accept plea of guilty even though defendant does not admit guilt).

**5.** Section 2–501(g) of the Public Safety Article, Maryland Code (2003) defines "DNA Sample" and provides:

"DNA Sample" means a body fluid or tissue sample that is (1) provided by an individual who is convicted of a felony or a violation of [Section] 6–205 [misdemeanor burglary in the fourth degree] or [Section] 6–206 [misdemeanor breaking and entering a motor vehicle] of the Criminal Law Article; or (2) submitted to the statewide DNA data base system for analysis as part of a criminal investigation.

**6.** Section 2–501(h) of the Public Safety Article, Maryland Code (2003) defines "Statewide DNA data base system" and provides:

"Statewide DNA data base system" means the DNA record system administered by the Department [of Maryland State Police] for identification purposes.

**7.** Section 2–501(f) of the Public Safety Article, Maryland Code (2003) defines "DNA record" and provides:

(1) "DNA record" means DNA information stored in CODIS or the statewide DNA database system. (2) "DNA record" includes the information commonly referred to as a DNA profile.

**8.** Section 2–501(b)(1) of the Public Safety Article, Maryland Code (2003) defines "CODIS" and provides:

After a search of CODIS revealed no match, the complainant's assailant remained unknown.

### May 18, 2004

After Anne Arundel County Police obtained funding through a private grant to conduct DNA tests in cold cases, they submitted the 1994 vaginal swab collected during the forensic medical examination for testing, along with more than 50 samples from other "cold cases."

### September 9, 2005

One year and four months later, the testing of the 1994 vaginal swab yielded a DNA profile of that assailant.

### Unknown Date

The Anne Arundel County Police uploaded the DNA profile of the 1994 assailant into CODIS, thereby creating a DNA record.

### December 7, 2006

The Anne Arundel County Police Crime Lab compared the DNA record of the 1994 assailant against the records in CODIS and determined that the 1994 DNA record matched the DNA record of the rape victim's assailant in 2002. Detective Tracy Morgan, an investigator in the Anne Arundel County Sex Offense Division, was informed that Williamson, who pleaded guilty to battery in the 1994 incident, may have been involved in both the 1994 and 2002 incidents.

### December 11, 2006

After Detective Morgan learned that Williamson had an open arrest warrant on unrelated charges, she contacted the

---

"CODIS" means the Federal Bureau of Investigation's "Combined DNA Index System" that allows the storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories.

Section 2–502 mandates that Maryland's DNA database system be compatible with CODIS.

Anne Arundel County Police Criminal Unit to arrest him and bring him to the Eastern District Police Station in Pasadena. While Williamson was being arrested, arrangements were being made to secure a meal for him while he was awaiting booking, a procedure followed by the Pasadena precinct. A meal from McDonald's was secured and brought to the Eastern District Police Station where Williamson was held, while awaiting booking. Williamson accepted the meal, and after having finished eating, discarded the wrappers and cup on the floor of the cell. When Williamson left the cell, Detective Morgan entered and retrieved the McDonald's cup and took it to the crime lab to have it tested for DNA. The crime lab tested Williamson's DNA on the cup, which yielded a DNA record matching the DNA record of the 2002 assailant.

### December 14, 2006

Detective Morgan submitted an application for an arrest warrant for the 2002 rape, upon which she predicated probable cause upon the following: (1) the match between the DNA records from the 1994 and 2002 forensic medical examinations, and (2) the match between the DNA records from the 2002 forensic medical examination and the McDonald's cup.[9] Williamson was arrested in connection with the 2002 rape and was interviewed at the Eastern District Police Station at which time he confirmed his home address in 2000 and 2001 at a location not far from the 2002 rape scene.

A grand jury indicted Williamson on charges of rape in the first and second degrees, sexual offense in the first and second degrees, unnatural and perverted sexual practice, assault in the first and second degrees, and reckless endangerment, for the 2002 incident.

As one of its pretrial motions, the State filed a Motion to Give Saliva Samples, and the Circuit Court for Anne Arundel

---

**9.** Section 2–510 of the Public Safety Article, Maryland Code (2003) provides that, "[a] match obtained between an evidence sample and a data base entry may only be used as probable cause and is not admissible at trial unless confirmed by additional testing."

County ordered Williamson to provide a saliva sample on February 26, 2007. Williamson filed an Emergency Motion for Appropriate Relief, arguing that the Court should rescind or recall its order, because he was challenging and would continue to challenge the testing of his previously acquired samples of DNA and the alleged illegal seizure of his DNA on December 11, 2006. The Court denied Williamson's motion. A DNA sample was collected from Williamson and again yielded a DNA record matching that of the 2002 rape assailant.

Judge Paul A. Hackner held a suppression hearing and denied Williamson's motion to suppress the DNA taken from him in 1994, 2006, and 2007. Judge Hackner based his decision, in part, on the following findings and conclusions regarding the 1994 DNA from the vaginal swab:

The Court finds as follows: The proffers—and I don't think there's any real factual dispute. And that's why there's probably no—there's no need for any evidence on this point. But the facts as I believe are undisputed are that the defendant's 1994 genetic material was collected by the police from the victim of the assault that occurred in 1994. It was not obtained from the defendant. And that's a huge, important distinction between that and all of the issues having to do with the DNA Collection Act.

The material that was deposited on the body or in the body of the victim in the 1994 case was retained by the police department and ultimately was processed, manipulated, if you will, compared to other samples and what have you.

In order for the Court to suppress either that result or anything that flows from it, I would have to conclude that there was a Fourth Amendment violation, which therefore means I would have to find that property was seized from the defendant or obtained from the defendant as a result of an unlawful search or seizure.

And I cannot imagine under what circumstances the Court could come to that conclusion when, by all possible

logic, the genetic material that was deposited in the 1994 victim was clearly abandoned. And at that point, there was no longer any expectation of privacy, reasonable or unreasonable for that matter, and certainly not one that society would honor.

And so without there being an expectation of privacy in that material, the defendant long ago lost any right to complain about what was done to it. So to the extent that that implicates his standing to challenge the 1994 sample and any subsequent activity that was involved with it, I find he has no standing.

And to the extent that he might have standing, I find that there is no reasonable expectation of privacy. Therefore, there is no violation of the Fourth Amendment. And I have not been told, and I don't find in my own readings of the material, that there is any statutory suppression that is appropriate.

So therefore, even if I were to assume for the sake of argument that there was some violation of the DNA Collection Act, I don't find that that's a basis to suppress the 1994 sample and the subsequent match of that 1994 sample to any other known information that the police had.

In addressing the motion to suppress the DNA retrieved from the McDonald's cup in 2006, Judge Hackner stated:

The Constitution, particularly the Fourth Amendment, protects against unreasonable searches and seizures. Period. The end. That's what it protects. And in order to have a claim that your Fourth Amendment right has been violated, you have to have a reasonable expectation of privacy.

And in this case, the Court finds that the defendant did not have a reasonable expectation of privacy in either the cup or the saliva or genetic material that he left on the cup as a result of drinking the soda or whatever it was that was it.

\* \* \*

[T]he Court finds as a factual matter that from the evidence before me there is no reasonable way for the Court to conclude that this defendant had any intentions whatsoever to hold on to that cup or to hold on to that trash or take it with him or to do anything to preserve some sort of property interest in it.

The fact of the matter is that he had neither a privacy interest in the materials, the cup, the paper bag, or what have you, nor did he have a property interest in the place form which they were seized, which is the temporary lockup cell that he was in.

\* \* \*

What we have here is clearly an area where he doesn't have any expectation of privacy to begin with and an object that he quite clearly left behind because he was done with it. And don't think that it's unlawful at this point for them to search the cell and collect the trash and then to ultimately analyze it.

So I don't find that the December 11, 2006 collection, if you will, of his DNA from the McDonald's cup was unlawful and is not subject to suppression. And I will deny the motion to suppress it.

With respect to Williamson's statement regarding the location of his home in 2000 and 2001, Judge Hackner denied its suppression and opined:

I find that the arrest that occurred on or about December 14 was premised upon adequate and reasonable probable cause. And that, therefore, means that the statement is lawfully acquired, given that there is no Miranda violation. So with respect to the motion to suppress the statement, the motion is denied.

## STANDARD OF REVIEW

When we review a trial court's grant or denial of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment, we view the evidence adduced at the suppression hearing, and the inferences fairly

deducible therefrom, in the light most favorable to the party that prevailed on the motion. *Bailey v. State,* 412 Md. 349, 362, 987 A.2d 72, 80 (2010), *Crosby v. State,* 408 Md. 490, 504, 970 A.2d 894, 902 (2009); *Longshore v. State,* 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007); *State v. Nieves,* 383 Md. 573, 581, 861 A.2d 62, 67 (2004); *Laney v. State,* 379 Md. 522, 533, 842 A.2d 773, 779 (2004). We defer to the trial court's fact-finding at the suppression hearing, unless the trial court's findings were clearly erroneous. *Bailey,* 412 Md. at 362, 987 A.2d at 80; *Crosby,* 408 Md. at 504–05, 970 A.2d at 902. Nevertheless, we review the ultimate question of constitutionality de novo and must "make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case." *Bailey,* 412 Md. at 362, 987 A.2d at 80.

### DISCUSSION

Williamson argues that Circuit Court judge erred in denying his motion to suppress the DNA evidence obtained in 2006 and his statement to police. Williamson contends that at least four acts violated his statutory and constitutional rights, which ultimately led to the "cold hit" match that implicated him in the 2002 rape. First, he appears to argue that the "police-created abandonment" of the McDonald's cup in 2006 led to its illegal and warrantless DNA testing. Second, he asserts that even though the 1994 DNA may have been obtained lawfully, it was unlawfully uploaded to a database in violation of the Maryland DNA Collection Act. Third, he contends that the subsequent search of the database to find a match for the 1994 DNA sample required a warrant and was conducted in violation of the Maryland DNA Collection Act and the Fourth Amendment. Finally, Williamson argues that the previous three events, which he contends violated the Fourth Amendment and led to his unlawful arrest, tainted his statement to police, despite having been given his *Miranda* rights.

The State contends under the Fourth Amendment that the Circuit Court correctly denied the motion to suppress the DNA evidence and the statement to police, because the evidence was obtained as a result of a lawful arrest and willful abandonment of his DNA. The State asserts that the police

lawfully acquired Williamson's discarded McDonald's cup, which allowed them to test the DNA on the cup "without running afoul of the Fourth Amendment." The State then alleges that the testing of the 1994 DNA sample and the uploading of the DNA record was lawful, because the DNA sample was legitimately collected from a crime scene and the Maryland DNA Collection Act neither includes an exclusionary rule nor prohibits the querying of lawfully acquired DNA records in CODIS. Finally, the State argues that Williamson's arrest was lawful such that his statement to police was admissible.

## A. McDonald's Cup

### 1. Abandonment of Cup

There is some confusion about whether Williamson is pursuing the issue of abandonment of the McDonald's cup on appeal, because in his brief, he argues there was no abandonment of the cup, but later states that "its removal from that cell was lawful"; this contradiction was exacerbated at oral argument when Williamson's counsel was asked about whether the appellant was pursuing an abandonment claim and counsel appeared to vacillate:

> We are certainly challenging the use of the DNA from the cup. . . . It was not the taking of the cup, the seizure of the cup was legal, obviously a cell has to have trash removed from it. . . . Abandonment implies a volitional act of relinquishment. The Attorney General refers to abandonment in the property law sense and that was the traditional approach prior to *Katz v. United States*, [389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)]. . . . A justified expectation of privacy may exist as to items which have been abandoned in the property sense.

Although it is unclear whether the abandonment issue is before us, discretion is the better part of valor,[10] and we will

---

**10.** William Shakespeare, The First Part of King Henry the Fourth act 5, sc. 4. (Falstaff: "The better part of valour is discretion; in the which better part I have saved my life.").

address whether Williamson's discarding of the McDonald's cup constituted an abandonment of the cup from which DNA was taken, which would appreciably affect our Fourth Amendment analysis.

■■■ The Fourth Amendment to the United States Constitution, made applicable to the States through the adoption of the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Paulino v. State*, 399 Md. 341, 349, 924 A.2d 308, 313 (2007). The person invoking Fourth Amendment protections bears the burden of demonstrating his or her legitimate expectation of privacy in the place searched or items seized. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226 (1979). In *Laney v. State*, 379 Md. 522, 545, 842 A.2d 773, 786–87 (2004), we explained that this burden consists of two inquiries, "(1) whether the individual has a subjective expectation that his or her property or possessions will not be searched, and (2) whether the expectation is objectively reasonable under the circumstances." *Accord Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373, 379 (1998); *California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988); *Rakas v. Illinois*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387, 401–02 n. 12 (1978); *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587–88 (1967) (Harlan, J., concurring); *Wallace v. State*, 373 Md. 69, 81, 816 A.2d 883, 890 (2003).

■ In *Katz v. United States*, Justice John M. Harlan, in a concurring opinion, expressed a two-prong test, which we have adopted, *Venner v. State*, 279 Md. 47, 51–52, 367 A.2d 949, 952 (1977), requiring that the person claiming protection under the Fourth Amendment demonstrate an actual (subjective) expectation of privacy in the item or place searched, as well as prove that the expectation is one that society is prepared to recognize as reasonable. *Katz*, 389 U.S. at 361, 88 S.Ct. at

516, 19 L.Ed.2d at 587–88. A person demonstrates a subjective expectation of privacy by showing that he or she sought "to preserve something as private." *McFarlin v. State,* 409 Md. 391, 404, 975 A.2d 862, 869 (2009), citing *Whiting v. State,* 389 Md. 334, 349, 885 A.2d 785, 793–94 (2005), quoting *Smith,* 442 U.S. at 740, 99 S.Ct. at 2580, 61 L.Ed.2d at 226–27. In discussing the scope of a legitimate expectation of privacy, the Supreme Court has opined that an objectively reasonable expectation of privacy has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society," and constitutes "more than a subjective expectation of not being discovered." *Rakas,* 439 U.S. at 143–44 n. 12, 148, 99 S.Ct. at 430–31 n. 12, 433, 58 L.Ed.2d at 401–02 n. 12, 404; *see also McFarlin,* 409 Md. at 404, 975 A.2d at 869. In *Greenwood* the Supreme Court stated that, "[a]n expectation of privacy does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable." *Greenwood,* 486 U.S. at 39–40, 108 S.Ct. at 1628, 100 L.Ed.2d at 36; *see also Wallace,* 373 Md. at 80–81, 816 A.2d at 890.

 Fourth Amendment protection, however, does not extend to property that is abandoned or voluntarily discarded, because any expectation of privacy in the item searched is discarded upon abandonment. *Stanberry v. State,* 343 Md. 720, 731, 684 A.2d 823, 828–29 (1996), citing *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668, 687 (1960); *see also Morton v. State,* 284 Md. 526, 531, 397 A.2d 1385, 1388 (1979); *Everhart v. State,* 274 Md. 459, 483, 337 A.2d 100, 114 (1975). The test for determining whether property is abandoned for purposes of the Fourth Amendment differs from the property law concept of abandonment and instead, focuses on whether the owner of the property retained a reasonable expectation of privacy in the article alleged to be abandoned. *Stanberry,* 343 Md. at 732, 684 A.2d at 829, citing *Venner,* 279 Md. at 53, 367 A.2d at 952.

In *Venner*, 279 Md. at 48–49, 367 A.2d at 950–51, Charles Venner, having been convicted on drug charges, argued that evidence derived from the seizure of balloons, containing hashish oil, from his stools, excreted in a hospital, should be suppressed, because the police did not obtain a search warrant for the balloons. We held that Venner did not maintain an expectation of privacy in his excrement, and that the stools were abandoned property, because he "could not have had an 'expectation . . . that society [would be] prepared to recognize as "reasonable" ' a property right in human excreta for the simple reason that human experience is to abandon it immediately." *Id.* at 59, 367 A.2d at 956 (alterations in original), quoting *Katz*, 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587–88.

In finding the warrantless search of the defendant's stools constitutional, we relied on *United States v. Cox*, 428 F.2d 683 (7th Cir.1970), and found persuasive its examination of the warrantless seizure and analysis of hair clippings procured from an incarcerated individual named Charles Layton Cox and used to connect him to another strand of hair left at the scene of a robbery. The hair samples in question were obtained after a routine haircut of Cox while he was in jail, although at the behest of the FBI in the instance in question. After Cox's hair was cut, the "barber" preserved the hair clippings in an envelope and sent them to the FBI for analysis. Cox argued that, absent emergency circumstances, the warrantless seizure of his hair samples by the police constituted a violation of his Fourth Amendment rights. The Seventh Circuit, however, found that the Government's seizure and preservation of the hair clippings occurred after Cox had voluntarily abandoned his hair, so Cox could not object to the appropriation and subsequent testing of his hair. *Id.* at 687–88.

Here, Williamson unequivocally abandoned the McDonald's cup after he had been offered a meal, accepted it, and then threw the debris from the meal on the floor. He certainly did not retain the cup as his own and clearly, while in the premises of the prison, could not reasonably expect that the

police would not collect, and potentially investigate, the trash he discarded in his cell. *See Brashear v. State*, 90 Md.App. 709, 723, 603 A.2d 901, 907, 1992 Md.App. Lexis 129, *19–20 (1992) (holding that it would be "ludicrous" for a prisoner to presume that a crumbled piece of paper left in an interrogation room would be disposed of without police examination), citing *Hudson v. Palmer*, 468 U.S. 517, 525–26, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393, 402–03 (1984) (holding that a prisoner had no reasonable expectation of privacy in his jail cell).

We have found no cases, and Williamson cites to none, that support the notion that Williamson did not abandon the cup, from which he drank, when he discarded it on the floor of the holding cell.[11] Rather, quite the opposite is true. In similar circumstances, courts in other jurisdictions have ordained that abandonment had occurred. *See Piro v. State*, 146 Idaho 86, 190 P.3d 905 (Ct.App.2008) (holding that a suspect did not have a reasonable expectation of privacy in his discarded genetic material left on a water bottle in an interrogation room); *State v. Glynn*, 38 Kan.App.2d 437, 166 P.3d 1075

---

**11.** Williamson cites *State v. Reed*, 182 N.C.App. 109, 641 S.E.2d 320 (2007), for the proposition that the "police created abandonment" of the McDonald's cup was involuntary and did not justify the detective's "furtive" seizure of the item containing his DNA.

In *Reed*, a police officer who had requested Blake Reed to submit a DNA sample as part of an ongoing investigation, questioned Reed on the patio of his home. During the conversation, Reed smoked a cigarette and placed the remains of the cigarette in his pocket while mentioning the television show CSI: Crime Scene Investigation. Reed lit another cigarette, and after smoking it, discarded it on a pile of trash on the patio. The police detective kicked the butt off the patio into the common grassy area, and later retrieved the butt for DNA testing, which confirmed that the DNA from the cigarette matched the DNA on the victim's shirt. At trial, Reed's motion to suppress the evidence was denied, and in his appeal argued that the DNA evidence was seized in violation of a warrantless, nonconsensual search of an area in which he had a reasonable expectation of privacy. The appellate court held that Reed had a reasonable expectation of privacy on his patio and the seizure of the cigarette was unconstitutional. *Id.* at 321.

*Reed* is distinguishable from the case at bar, because Reed maintained an expectation of privacy in that cigarette discarded on the patio of his home, unlike Williamson who maintained no reasonable expectation of privacy in the McDonald's cup he voluntarily discarded on the floor of his holding cell.

(2007) (holding there was no constitutional violation or infringement of privacy rights when the police used a lawfully obtained DNA profile from one case to investigate and charge the DNA donor in a subsequent and different case); *Commonwealth v. Perkins*, 450 Mass. 834, 883 N.E.2d 230 (2008) (holding that a defendant did not have a reasonable expectation of privacy in his abandoned cigarette butts or soda can that he left in an interrogation room and were subsequently tested for his DNA); *Commonwealth v. Cabral*, 69 Mass.App. Ct. 68, 866 N.E.2d 429 (2007) (holding a defendant did not maintain an expectation of privacy in spit he expectorated on a public sidewalk, or the DNA retrieved from his saliva; objectively, society would not recognize his expectation of privacy in his spittle as reasonable); *Commonwealth v. Ewing*, 67 Mass. App.Ct. 531, 854 N.E.2d 993 (2006) (holding that a defendant did not have a reasonable expectation of privacy in cigarette butts that he voluntarily abandoned as trash, and the DNA evidence obtained was admissible, absent evidence of coerced abandonment, even if the defendant's trash was obtained under a ruse); *People v. Sterling*, 57 A.D.3d 1110, 869 N.Y.S.2d 288 (2008) (holding that once the police lawfully obtained a discarded milk carton from an imprisoned defendant, he no longer retained any expectation of privacy in his discarded genetic material); *People v. Ayler*, 5 Misc.3d 1020, 799 N.Y.S.2d 162 (N.Y.Sup.Ct.2004) (holding that a defendant did not have any expectation of privacy in his discarded cigarette butts seized from an interrogation room, as well as the DNA results obtained therefrom); *People v. Barker*, 195 Misc.2d 92, 757 N.Y.S.2d 692 (Monroe County Ct.2003) (holding that a jailed defendant had no reasonable expectation of privacy in a plastic spoon discarded in his cell or his DNA profile gleaned from the spoon after it was thrown away); *State v. Athan*, 160 Wash.2d 354, 158 P.3d 27 (2007) (holding that a police ruse to obtain DNA from a suspect's saliva after his licking an envelope was constitutional and the DNA evidence was admissible under both state and federal constitutions, because the defendant could not maintain a reasonable expectation of privacy in his discarded genetic material, there

was no recognized privacy interest in voluntarily discarded saliva, and there exists a legitimate government purpose in collecting a suspect's discarded DNA for identification purposes).

### 2. Testing of Cup

■ Williamson argues that even if the police officer's seizure of the cup was lawful, the testing of DNA on the cup was a separate search, and that it was unreasonable to conduct the test merely because the police had lawfully seized something with Williamson's DNA, because he was being detained and because he had a reasonable expectation of privacy in his DNA. Williamson contends that the testing of the DNA sample violated the Maryland DNA Collection Act, and specifically, Section 2–504 of the Public Safety Article. The State argues, conversely, that a "search" of the cup never occurred, because the cup was abandoned property not entitled to Fourth Amendment protection, and neither the Maryland DNA Collection Act nor the Fourth Amendment prohibited the State from analyzing a lawfully acquired DNA sample.

Section 2–504 of the Public Safety Article, which limits collection of DNA samples from certain convicted individuals, provides in relevant part:

(a) *In general.*—(1) In accordance with regulations adopted under this subtitle, and if adequate funds for the collection of DNA samples are appropriated in the State budget, an individual who is convicted of a felony or a violation of [Section] 6–205 [misdemeanor burglary in the fourth degree] or [Section] 6–206 [misdemeanor breaking and entering a motor vehicle] of the Criminal Law Article shall:

(i) have a DNA sample collected on intake to a correctional facility, if the individual is sentenced to a term of imprisonment; or

(ii) provide a DNA sample as a condition of sentence or probation, if the individual is not sentenced to a term of imprisonment.

Had the police compelled Williamson to give a DNA sample as a pretrial detainee, Williamson's argument may have had some weight. Williamson, however, was not compelled to give his DNA, which, according to Section 2-505(a) of the Public Safety Article, could be collected and tested for a number of reasons:

(a) *In general.*—To the extent fiscal resources are available, DNA samples shall be collected and tested:

(1) to analyze and type the genetic markers contained in or derived from the DNA samples;

(2) as part of an official investigation into a crime;

(3) to help identify human remains;

(4) to help identify missing individuals; and

(5) for research and administrative purposes, including:

(i) development of a population data base after personal identifying information is removed;

(ii) support of identification research and protocol development of forensic DNA analysis methods; and

(iii) quality control.

Williamson, nevertheless, cites *United States v. Mitchell,* 2009 U.S. Dist. Lexis 103575 (W.D.Pa.2009), and *United States v. Amerson,* 483 F.3d 73 (2d Cir.2007), for the proposition that the collection of DNA from a pretrial detainee and a probationer, respectively, pursuant to federal law, the DNA Analysis Backlog Elimination Act of 2000, 42 U.S.C. § 14135a, and the Justice for All Act of 2004, which expanded the 2000 law, respectively, violate the Fourth Amendment, under totality of the circumstances and special needs tests. In *Mitchell,* the Government requested that a pretrial detainee, Ruben Mitchell, who had been arrested on a drug charge and was then before a magistrate judge for his initial appearance, provide a DNA sample pursuant to the federal act, to which Mitchell objected. The federal district judge held that the Government could not forcibly collect a DNA sample from a pretrial detainee, even though the federal act so provided, because of the absence of a warrant, in violation of the Fourth Amend-

ment. In *Amerson,* two convicted felons who were sentenced to probation for non-violent crimes, challenged the constitutionality of the Justice for All Act, which requires all felons to submit a DNA sample for testing and storage. The Second Circuit Court of Appeals held that the primary purpose of the Act was "to obtain a reliable record of an offender's identity that can then be used to help solve crimes," and because the testing and storage of DNA samples fulfilled important governmental interests, and the invasion of privacy of the convicted felons was relatively small, the Act was constitutional, because it did not constitute an unreasonable search or seizure in violation of the Fourth Amendment. *Amerson,* 483 F.3d at 81, 89. The analysis in *Mitchell* and *Amerson,* however, of the constitutionality of the federal statutes requiring a pretrial detainee or a convicted felon to submit a DNA sample, is completely inapplicable to the case at bar in which we determine abandonment and lawful collection of DNA.

Williamson also argues that the Fourth Amendment proscribes that a warrant is required to test lawfully acquired DNA samples and that he had a heightened privacy interest in avoiding DNA testing, because of the amount of information that could be revealed, rather than the identity information gleaned in the present case. He claims that, "DNA samples can reveal comprehensive, inherently private information including family lineage, predisposition to over 4,000 types of genetic conditions and diseases, and genetic markers for traits like aggression, sexual orientation, substance addiction, and criminal tendencies." He argues that the State's use of technology to test Williamson's DNA and "reveal information not visible to the naked eye" was a search, which violated his reasonable expectation of privacy.

The State counters that while genetic privacy concerns are important and worthy of public debate, there is no constitutional or legislative prohibition against testing lawfully acquired DNA *for identification purposes.* The State contends that because Williamson never developed a reasonable expectation of privacy in the disposable paper products from the McDonald's meal, the police did not violate, and could not have

violated, his Fourth Amendment rights, because no unlawful search or seizure took place.

It is important from the outset to emphasize that the Maryland DNA Collection Act limits the depth of DNA testing and the storage of the results to that data that is directly related to the identification of an individual. Specifically, Section 2-505(b) of the Public Safety Article provides:

(1) Only DNA records that directly relate to the identification of individuals shall be collected and stored.

(2) DNA records may not be used for any purposes other than those specified in this subtitle.

At no point does Williamson ever allege that the State misused his DNA for purposes other than identification in contravention of the Maryland DNA Collection Act, but relies on allegations of a "parade of horribles."

In *State v. Raines*, 383 Md. 1, 25, 857 A.2d 19, 33 (2004), we already recognized that the only information collected from testing and storage of DNA profiles is the identity of the person whose DNA is being tested under the Maryland DNA Collection Act, and the purpose of uploading DNA profiles to CODIS is "akin to that of a fingerprint." [12] Our sister courts also have recognized, as we did in *Raines*, that DNA testing and storage is limited to identification purposes, such as in the

---

**12.** We note that fingerprinting was challenged in its infancy because it was alleged to be a humiliating process, but the Second Circuit Court of Appeals in *United States v. Kelly*, 55 F.2d 67 (2d Cir.1932), determined that the procedure served the same function of identification that had been used for years:

Finger printing seems to be no more than an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal laws. It is known to be a very certain means devised by modern science to reach the desired end, and has become especially important in a time when increased population and vast aggregations of people in urban centers have rendered the notoriety of the individual in the community no longer a ready means of identification.

*Id.* at 69. In holding that a fingerprint requirement of arrested people was justified, the federal court relied on *Downs v. Swann*, 111 Md. 53, 73 A. 653 (1909), and equated fingerprinting to another constitutional method of identification—photographs.

present case. *See State v. Hauge,* 103 Hawai'i 38, 79 P.3d 131 (2003) (rejecting a parade of horribles argument where DNA is being used for identification purposes only); *United States v. Davis,* 657 F.Supp.2d 630, 656 n. 6 (D.Md.2009) (noting that DNA profiles contained in CODIS consist of analyses of 13 "junk" loci consisting of stretches of DNA, which do not presently recognize traits and were purposely selected because they are not associated with any known physical or medical characteristics).

Williamson's arguments regarding his expectation of privacy in his DNA do not relate to the 13 "junk" loci used for identification, but on the potential misuse of DNA, which is not in issue in the present case, whereby Williamson's DNA was tested for identification only. While there may be debate regarding privacy concerns should technological advances permit testing of DNA to glean more information from acquired DNA than mere identification, that debate does not have "feet" in the present case. *See* Elizabeth E. Joh, *Reclaiming "Abandoned" DNA: The Fourth Amendment and Genetic Privacy,* 100 Nw. U.L.Rev. 857, 870–71 (2006); Simon A. Cole, *Is the "Junk" DNA Designation Bunk?,* 102 Nw. U.L.Rev. Colloquy 54 (2007); D.H. Kaye, *Please, Let's Bury the Junk: The CODIS Loci and the Revelation of Private Information,* 102 Nw. U.L.Rev. Colloquy 70 (2007).

In a creative assertion, Williamson then cites to *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), and *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), for the proposition that DNA is akin to a container that requires a warrant to be searched for its contents. In *Walter,* the Federal Bureau of Investigation (FBI) lawfully acquired "12 large, securely sealed packages containing 871 boxes of 8–millimeter film depicting homosexual activities" that were delivered to a private company and later handed over to the FBI. 447 U.S. at 651–52, 100 S.Ct. at 2399, 65 L.Ed.2d at 414–15. The boxes suggested explicit content, and several FBI agents viewed the films without first obtaining a warrant. The defendants were thereafter indicted on obscenity charges. A motion to suppress and return the

films was denied, and the defendants were convicted. The Supreme Court reversed, holding that the defendants had a reasonable expectation of privacy in the packages, and their Fourth Amendment rights were violated when the government viewed the films without a search warrant. The Court held that "the unauthorized exhibition of the films constituted an unreasonable invasion of their owner's constitutionally protected interest in privacy. It was a search; there was no warrant; the owner had not consented; and there were no exigent circumstances." *Id.* at 654, 100 S.Ct. at 2400, 65 L.Ed.2d at 416.

*Walter* is distinguishable, however, because the DNA collected in the present case is more akin to that of fingerprints, as we noted in *Raines*, 383 Md. 1, 18 n. 11, 857 A.2d 19, 29 n. 11. Judge Irma S. Raker, then an active member of this Court, in her concurring opinion in *Raines*, aptly noted that although the analogy to fingerprints may be employed, a DNA profile really resembles a series of numbers, such as a social security number:

> DNA type need be no more informative than an ordinary fingerprint. . . . The numbers [constituting the DNA profile] have no meaning except as a representation of molecular sequences at DNA loci that are not indicative of an individual's personal traits or propensities.

*Raines*, 383 Md. at 45, 857 A.2d at 45–46 (Raker, J., concurring).

Williamson argues, nevertheless, that even if he abandoned the McDonald's cup, he did not abandon his privacy interest in his genetic material, and the testing of the DNA found on the McDonald's cup constituted a warrantless search implicating the Fourth Amendment. He cites *United States v. Davis*, 657 F.Supp.2d 630 (D.Md.2009), for the proposition that the extraction and testing of his DNA were searches subject to Fourth Amendment scrutiny, as well as *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *Blasi v. State*, 167 Md.App. 483, 893 A.2d 1152 (2006), for the suggestion that testing of DNA is

akin to urine analysis and field sobriety tests, respectively, which have been held to constitute searches under the Fourth Amendment. The State counters that *Davis* is inapplicable to the instant case, because the Fourth Amendment query relies on the expectation of privacy in the item left behind, rather than the genetic information contained within it, and because Williamson abandoned the McDonald's cup, he also abandoned any expectation of privacy.

In *Davis,* 657 F.Supp.2d at 630, a gunshot-wound victim, Earl Whittley Davis, had his clothes lawfully seized and taken into evidence by police. Years later, after Davis became a suspect in an unrelated murder case, the police retrieved Davis' bloody clothes, extracted the blood from the clothes, and tested the DNA, which exculpated Davis in a murder investigation. *Id.* at 634–35. Davis' DNA profile was then placed in the local DNA database.

Several months later, a DNA sample of an unknown assailant was retrieved from evidence at a murder scene, tested, and uploaded to CODIS. The uploading resulted in a "hit" between the DNA found at the crime scene and the DNA profile of Davis. A search warrant was executed and a second DNA sample was taken from Davis and compared to the evidence recovered at the crime scene. A DNA analyst concluded that, to a reasonable degree of scientific certainty, Davis was the source of the DNA located on evidence recovered from the crime scene. *Id.* at 635. Davis moved to suppress the DNA evidence arguing that the seizure of his clothing, the extraction of DNA from his clothing, and the uploading of his DNA to CODIS violated his Fourth Amendment rights. *Id.* at 636.

The federal district court held that Davis, who had his clothes lawfully seized when he was a victim of a crime, had a greater expectation of privacy in his DNA than someone who had been arrested, convicted, or otherwise compelled to give a sample of his DNA. The district court judge noted, however, that television series such as "CSI" and "NCIS" "should have put Davis on notice that his DNA *could* someday be tested."

*Id.* at 651–52 (emphasis in original). The Court stated that in a situation where a victim becomes a suspect, the best practice for the police would be to seek a warrant before performing a DNA search on a sample, but held that under the totality of the circumstances, the extraction and testing of Davis' DNA profile for comparison to the crime scene sample from the murder was reasonable, because the government's compelling interest in identifying the perpetrator in an ongoing homicide investigation outweighed Davis' diminished privacy interests in his DNA. *Id.* at 653–54.

The district court judge, however, specifically distinguished his suggestion that a warrant was preferred, from those facts implicated in cases such as the present one, in which "covert involuntary DNA sampling" has been upheld under an abandonment analysis. *Id.* at 649, citing *California v. Greenwood,* 486 U.S. 35, 39–40, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988); *Commonwealth v. Bly,* 448 Mass. 473, 862 N.E.2d 341, 356–57 (2007) (suspect connected to murder by DNA analysis of abandoned water bottle and cigarette butts left in an interview with police); *State v. Wickline,* 232 Neb. 329, 440 N.W.2d 249, 252–53 (1989) (DNA testing of abandoned cigarettes left at police station did not violate Fourth Amendment); *State v. Athan,* 160 Wash.2d 354, 158 P.3d 27, 31, 33–34 (2007) (comparison of DNA analysis of DNA obtained without forcible compulsion and DNA left at a crime scene was constitutional). The district court judge noted that in situations involving "covert involuntary DNA sampling," such as when a person spits out gum or throws away a used tissue, "the individual has actively demonstrated an intent to abandon the item, and, necessarily, any DNA that may be contained thereon." *Davis,* 657 F.Supp.2d at 649.

The analysis in *Davis* is supportive of our holding in the present case, because the voluntary abandonment of the McDonald's cup did not implicate an unconstitutional seizure under the Fourth Amendment. Similarly, although *Skinner* and *Blasi* held that a urine test and field sobriety test, respectively, constituted searches within the meaning of the Fourth Amendment, the Supreme Court and Court of Special

Appeals held that these warrantless searches in their respective cases, were not unreasonable and, therefore, constitutionally permissible.

We have found no case that limits the testing of blood or fingerprint impressions by computer in the fashion that Williamson suggests is necessary with his saliva containing the DNA in the present case, and certainly no case that has limited the testing of lawfully acquired DNA. It would be anomalous, indeed, for us to hold that a warrant would be necessary to analyze the contents of lawfully acquired abandoned property—property in which the previous owner did not retain a reasonable expectation of privacy, because the resulting information was inculpatory of Williamson's identity, while encouraging testing without a warrant to determine exculpatory information. *See State v. Sampson,* 362 Md. 438, 765 A.2d 629 (2001) (holding that the warrantless search and seizure of garbage left for collection within the curtilage of the home did not violate the Fourth Amendment because the owner did not maintain a reasonable expectation of privacy in the trash), citing *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (holding that the warrantless search and seizure of garbage left for collection outside the curtilage of the home did not violate the Fourth Amendment).

**B. Uploading the 1994 DNA Sample to a Database and the Query of the Database**

Williamson next argues that his DNA could not be uploaded to a database, because it was not a "forensic unknown" sample from a crime scene. Williamson also asserts that he was not in the class of persons whose sample could be lawfully uploaded to the database pursuant to the Maryland DNA Collection Act. The State argues that no provision of the Maryland DNA Collection Act limits the DNA records that may be uploaded to CODIS to records of convicted felons or "forensic unknowns," and further, that the statute does not have an exclusionary rule. The State also contends that the uploading of Williamson's DNA record to CODIS was lawful, because the statute implies that DNA records from sources

other than convicted offenders will be uploaded to CODIS, such as in the situation where DNA records are used to exonerate existing suspects.

The question remains whether there are any statutory or constitutional restrictions to uploading the test results of lawfully obtained DNA. It would be counterintuitive to say that the police could not upload a lawfully obtained DNA sample to identify an assailant, but could upload a DNA sample to exclude a defendant from a class of people who may have committed a crime. As we remarked in *Raines*, 383 Md. at 41, 857 A.2d at 43, there is a "legitimate governmental interest in identifying persons involved with crimes, including vindicating those falsely convicted." If knowing the identity of the individual from whom the DNA sample was taken makes it unlawful to upload, then what is the future of any attempt to vindicate a falsely convicted individual or to exclude people suspected of crimes? *See United States v. Davis*, 657 F.Supp.2d 630, 634–35 (D.Md.2009) (the uploading of a lawfully obtained DNA sample excluded the defendant as a murder suspect).[13] The same result must abide the uploading of the DNA sample from the McDonald's cup.

Even though the Defendant separates the warrantless uploading of a DNA sample to a database from the warrantless searching of the database as two distinct illegal actions, we address them together and hold that it would be illogical to allow the police to upload a DNA sample but not allow a search of the database for a match.

---

**13.** In *United States v. Davis*, 657 F.Supp.2d 630 (D.Md.2009), the federal district court found that the warrantless maintenance of the victim's DNA profile in the local DNA database, after he was excluded as the assailant in the initial murder case, violated his Fourth Amendment rights as an unreasonable violation of his privacy. *Id.* at 665–66. Nevertheless, the district judge held that the exclusionary rule was not appropriate, because the police did not upload the DNA profile in flagrant or deliberate disregard of Davis' rights that would have warranted suppression. In any event, assuming the *Davis* rationale with regard to uploading were regarded as compelling, the uploading in the present case of the DNA profile is sustainable based on the dissimilar circumstances in the present case.

## C. Statement to Police

 Williamson argues that his statement to police regarding the location of his home in 2002 should be suppressed, because his arrest was based upon an illegally obtained DNA profile match—a result of the alleged violation of testing the DNA from the McDonald's cup, uploading the 1994 DNA sample to the database, and searching the database to find a match. He contends that *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), which held that in-custody statements made after an illegal arrest, were not admissible despite *Miranda* warnings, supports his contention that his statement was tainted and therefore inadmissible as the indirect fruit of an illegal search and arrest. The State contends that Williamson's arrest was legal, and thus, his statement to police should not be suppressed as fruit of a poisonous tree. We agree with the State.

 The arrest warrant and statement of charges against Williamson were based "upon the facts contained in the application of [Detective] Morgan," which rooted probable cause upon the match of the DNA retrieved from the crime scenes in 1994 and 2002, and upon the match of Williamson's DNA on the McDonald's cup to the 2002 DNA. Because we have held that the DNA samples leading to matches of Williamson's DNA were lawfully obtained and tested, Williamson's arrest warrant was founded upon probable cause. A statement to police pursuant to a lawful arrest and free of any Fifth Amendment violations, is admissible. *See Prioleau v. State*, 411 Md. 629, 638–39, 984 A.2d 851, 857 (2009). Thus, the motion to suppress Williamson's statement to police was properly denied.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY APPELLANT.**

BELL, C.J., dissents and files opinion in which GREENE, J., joins.

Dissenting Opinion by BELL, Chief Judge, which GREENE, J., joins.

## I.

Kelroy Williamson, the petitioner, was charged with a rape that occurred in 2002. The basis for the charge was the match between the petitioner's Deoxyribonucleic Acid ("DNA") profile and DNA acquired by vaginal swab during the examination of the victim in the 2002 case. The DNA from which the petitioner's DNA profile was developed was obtained by the Anne Arundel County police by a ruse. Having focused on the petitioner as a suspect in the rape as a result of the post-disposition testing of DNA[1] associated with an earlier case, in which the petitioner, although accused of rape, entered an *Alford* plea to battery,[2] the police obtained the DNA, from which the profile leading to the petitioner's charge and eventual conviction was developed, from a cup they had given him and from which the petitioner had drunk the contents, while being detained in a holding cell for failure to appear to answer a drug charge. After the petitioner was removed from the holding cell for booking, leaving the cup behind, as they knew he would, the police swabbed the rim of the cup, obtaining DNA, which was then tested and, as indicated, matched with the 2002 DNA profile. The acquisition of the DNA, its testing and its comparison with DNA profiles in the Maryland statewide DNA database all were accomplished without a warrant. The question this case presents is whether a warrant was required at any time during the

---

1. We need not decide whether the testing and the uploading of Williamson's Deoxyribonucleic Acid ("DNA") from this earlier case was valid under the Fourth Amendment, as that, as we shall see, is not dispositive. Whether, indeed, there would have been probable cause for a search of the petitioner's DNA is irrelevant since there was no search sought until after the DNA profile at issue in this case had been developed.

2. An " '*Alford* plea' " is a " 'guilty plea containing a protestation of innocence.' " *Marshall v. State*, 346 Md. 186, 189 n. 2, 695 A.2d 184, 185 n. 2 (1997).

police effort to obtain the petitioner's DNA, at issue in this case, when acquiring the DNA, when testing it and/or when conducting the comparison of it with the State database.[3]

---

3. Although acquiring DNA is separate and distinct from its analysis and testing, they are critically inextricably related. The acquisition of DNA without analyzing it is virtually meaningless. In its pure form, without the development of a profile, comparison is impossible. The late Ralph Brave, a science writer and former Center for Genetics Society Fellow, in his article, *So Much for the Evidence: DNA Profiling Could Revolutionize Law Enforcement in Maryland—If We Let It, Baltimore City Paper* (August 7, 2002), makes this clear. Discussing how the Bode Technology Group lab, located in Maryland and the one that did the analysis in this case, conducted DNA analysis, Brave explained:

"Blood or semen cells are extracted from whatever material they've become attached to and chemically broken open so that their DNA can be collected.

\* \* \*

"After making sure that there is enough DNA, a test is run to confirm that it is human by identifying a DNA sequence that has been conserved by evolution for millions of years and is only carried by humans and higher primates.

\* \* \*

"The DNA is then put into a machine called a thermocycler. After two and a half hours and several adjustments in temperature, the DNA in the thermocycler will have chemically copied itself millions of times. "Small tubes of the DNA are then placed in a genetic analyzer.... The number of repeats at each of the 13 sites is measured and the results fed into a computer, which produces a series of colored wave bands indicating the number of repeated patterns. This is that person's DNA profile, and only that person's (or his or her identical twin).

"The system for storing these profiles has three levels. Local law-enforcement agencies are charged with processing the evidence and obtaining the DNA profile. These profiles are uploaded and incorporated into state databases of convicted criminals (the states vary as to what crimes warrant inclusion) in Maryland and it is maintained by the State Police. Finally, the FBI operates the Combines DNA Index System (CODIS), through which states can compare a DNA profile gathered from a crime scene to all those in other states' systems. "Even if a particular profile doesn't match one in CODIS, the system is designed to periodically rerun the profile against any and all new additions."

Fingerprinting is quite different. A fingerprint is an impression "left by the depositing of oil upon contact between a surface and the friction ridges of fingers." *United States v. Mitchell,* 365 F.3d 215, 221 (3d Cir.2004). When the "latent"—which is derived "from the Latin [word] *lateo,* 'to lie hidden' [and is] often not visible to the naked eye," *id.*—print is lifted, there immediately is a comparison ready specimen. As *Mitchell* explains, there may be different levels of detail that may be

Believing that a warrant was required, the petitioner moved to suppress the use of his DNA profile. The trial court denied the motion to suppress. Focusing, apparently, solely on the acquisition of the DNA, it ruled that he abandoned the beverage cup and, thus, did not have a reasonable expectation of privacy. It explained:

"What we have here is clearly an area where [Williamson] doesn't have any expectation of privacy to begin with an object that he quite clearly left behind because he was done with it. And I don't think that it's unlawful at this point for [the police] to search the cell and collect the trash and then to ultimately analyze it.

"So I don't find that the December 11, 2006 collection, if you will, of his DNA from the McDonald's cup was unlawful and is not subject to suppression. And I will deny the motion to suppress it.

\* \* \*

"The Court finds that the taking of the DNA sample on December 11, 2006, was not unlawful.

The motions court reasoned:

"The Constitution, particularly the Fourth Amendment, protects against unreasonable searches and seizures. Period. The end. That's what it protects. And in order to have a claim that your Fourth Amendment right has been violated, you have to have a reasonable expectation of privacy.

"And in this case, the Court finds that the defendant did not have a reasonable expectation of privacy in either the cup or the saliva or genetic material that he left on the cup as a result of drinking the soda or whatever it was that was in it. I think you say that this was, you know, tantamount to them getting his swab is a little bit dramatic. You know, you touch it with your lips, you don't run it on the inside of your gums like you do for a swab.

\* \* \*

---

employed, but they relate to how the comparison is made, the means employed, rather than a further analysis of the print itself.

"[T]he Court finds as a factual matter that from the evidence before me there is no reasonable way for the Court to conclude that this defendant had any intentions whatsoever to hold on to that cup or to hold on to that trash or to take it with him or to do anything to preserve some sort of property interest in it.

"The fact of the matter is that he had neither a privacy interest in the materials, the cup, the paper bag, or what have you, nor did he have a property interest in the place from which they were seized, which is the temporary lockup cell that he was in."

## II.

The majority holds that "it was not error to deny [Williamson's] motion to suppress the DNA evidence obtained in 2006 or [Williamson's] statement to police, [thus] affirm[ing] the Circuit Court judge's dismissal of the motion to suppress." *Williamson v. State,* 413 Md. 521, 525, 993 A.2d 626, 629 (2010). The majority's holding, like the trial court's ruling, is largely predicated on abandonment:

"Although it is unclear whether the abandonment issue is before us, discretion is the better part of valor, and we will address whether Williamson's discarding of the McDonald's cup constituted an abandonment of the cup from which DNA was taken, which would *appreciably* affect our Fourth Amendment analysis."

*Id.* at 533–34, 993 A.2d at 633–34 (footnote omitted)(emphasis added).

Abandonment, as an issue, is not before this Court. Williamson does not disagree. In fact, he concedes that seizure and even the swabbing of the cup was not unlawful. By focusing on abandonment, however, the majority confuses the privacy interest which Williamson asserts. Rather than the seizure of the cup and the concomitant swabbing of that cup, he maintains that it is the chemical analysis of the DNA retrieved as a result of the swabbing, coupled with the comparison of the result of the analysis with profiles stored in the

State DNA database, that is at issue.[4] It is this invasion that, unless it can be shown by the State that some recognized exception applies, warrants Fourth Amendment protection.

When reviewing a denial of a motion to suppress evidence, this Court looks to the record of the suppression hearing and draws its legal conclusion using the *de novo* standard:

> "When reviewing the disposition of a motion to suppress evidence alleged to have been seized [and/or searched] in contravention of the Fourth Amendment to the U.S. Constitution, we view the evidence adduced at the suppression hearing, and the inferences fairly deductible therefrom, in the light most favorable to the party that prevailed on the motion. *State v. Williams*, 401 Md. 676, 678, 934 A.2d 38, 40 (2007); *Lewis v. State*, 398 Md. 349, 358, 920 A.2d 1080, 1085 (2007). In so doing, '[w]e extend great deference to the fact finding of the suppression court and accept the facts as found by the court unless clearly erroneous.' *Nathan v. State*, 370 Md. 648, 659, 805 A.2d 1086, 1093 (2002) (quoting *Wilkes v. State*, 364 Md. 554, 569, 774 A.2d 420, 429 (2001)). Nevertheless, in resolving the ultimate question of whether the . . . search of an individual's person or property violates the Fourth Amendment, we 'make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case.' *Williams*, 401 Md. at 678, 934 A.2d at 40; *see also Nathan*, 370 Md. at 659, 805 A.2d at 1093 ('We review the legal questions *de novo* and based upon the evidence presented at the suppression hearing and the applicable law, we then make our own constitutional appraisal.'). Our review ordinarily is limited to the record of

---

4. As indicated, *supra*, I do not address the legality or the propriety of uploading Williamson's DNA from the earlier case. That is because, whether legal or not, it does not dispose of the issue as to whether there was probable cause when the magistrate issued the search warrant pursuant to which the DNA profile admitted into evidence in this case was obtained. The affidavit submitted to establish the existence of probable cause relied on both the 1994 DNA profile and the 2006 DNA profile, developed from the DNA retrieved from the cup. It is the evidence resulting from the 2006 DNA analysis that is challenged as an illegal search and, thus, as requiring a search warrant.

the suppression hearing. *Lewis*, 398 Md. at 358, 920 A.2d at 1085; *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519, 524 (2000)."

*Crosby v. State*, 408 Md. 490, 504–05, 970 A.2d 894, 902 (2009). The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[5] U.S. Const. amend. IV. A "search" occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1984) (footnote omitted).

Generally, a search warrant is issued "only after a neutral and detached magistrate[6] determines that probable cause exists 'therefor from facts or circumstances presented to him under oath or affirmation,' in order to justify an invasion of privacy." *Winters v. State*, 301 Md. 214, 223, 482 A.2d 886, 890 (1984) (quoting *Nathanson v. United States*, 290 U.S. 41, 47, 54 S.Ct. 11, 13, 78 L.Ed. 159, 162 (1933)). "Probable cause" is:

"[A] nontechnical conception of a reasonable ground of a belief of guilt. A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge. . . . Therefore, to justify a warrantless arrest [or search] the police must point to specific and articulable facts which, taken together with

**5.** Through the Due Process Clause of the Fourteenth Amendment, the Fourth Amendment is applicable to the states. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961).

**6.** A neutral and detached magistrate has "severance and disengagement from activities of law enforcement." *Shadwick v. Tampa*, 407 U.S. 345, 350, 92 S.Ct. 2119, 2123, 32 L.Ed.2d 783, 789 (1972).

rational inferences from those facts, reasonably warranted the intrusion."

*State v. Wallace,* 372 Md. 137, 148, 812 A.2d 291, 297–98 (2002) (citations omitted) (quoting *Collins v. State,* 322 Md. 675, 680, 589 A.2d 479, 481 (1991)); *see Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). To determine whether a person has a reasonable expectation of privacy, courts employ a two-prong test:

"[The] understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable."

*Venner v. State,* 279 Md. 47, 51–52, 367 A.2d 949, 952 (1977).

Generally, warrantless searches are *per se* unreasonable. *McMillian v. State,* 325 Md. 272, 281, 600 A.2d 430, 434 (1992); *Ricks v. State,* 322 Md. 183, 188, 586 A.2d 740, 743 (1991). As explained by the United States Supreme Court:

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

*Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948) (footnote omitted). Thus, in a case of a warrantless search, such a search is unreasonable

under the Fourth Amendment, absent some recognized exception: *Ferguson v. City of Charleston*, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (special needs searches); *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (exigent circumstance—suspect is likely to flee before the pursuing officer can obtain a warrant); *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (inventory searches); *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (boarder searches); *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (administrative searches); *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (container searches); *United States v. Villamonte–Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983) (searches at sea); *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (vehicle searches); *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (exigent circumstance—the police in "hot pursuit" of a suspect); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (warrantless arrests); *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (searches incident to a valid arrest); *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973) (exigent circumstance—evidence sought is in imminent danger of destruction); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (consent searches); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion) (seizure of items in plain view); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (investigatory detentions);and *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)(exigent circumstance-the safety of law enforcement officers or the general public is threatened).

### III.

In my view, Williamson possessed a reasonable expectation of privacy in his DNA, which triggered Fourth Amendment protection, and the State failed to establish that any recog-

nized exception to the warrant requirement applied. Accordingly, because non-excepted warrantless searches are *per se* unreasonable, the search here was unconstitutional.

I do not dispute the majority's conclusion that the cup, along with the other items used by Williamson, were obtained by the police during the ordinary course of collecting trash for disposal, and neither does Williamson. But, as earlier indicated, that simply is not what is at issue in this case. The issue is whether a separate search, requiring a warrant, occurs when, from abandoned property, here, a McDonald's cup lawfully in the possession of the police, some other property, in this case, a DNA sample, is extracted for analysis, and analyzed, after which the result of that analysis, a DNA profile, is used for investigative purposes, *i.e.* uploaded to a database for comparison with the other DNA profiles it stores. I believe that it does and, furthermore, that the search is entitled to Fourth Amendment protection.

Critical to the majority's analysis and, thus, its holding is the applicability to this case of Maryland Code (2003) § § 2–504 and 2–505 of the Public Safety Article, the Maryland DNA Collection Act and *State v. Raines,* 383 Md. 1, 25, 857 A.2d 19, 33 (2004). It is on the basis of these authorities that it states: "[W]e already recognized that the only information collected from testing and storage of DNA profiles is the identity of the person whose DNA is being tested under the Maryland DNA Collection Act, and the purpose of uploading DNA profiles to CODIS is 'akin to that of a fingerprint,'" 413 Md. at 542, 993 A.2d at 639, and that "DNA testing and storage is limited to identification purposes. . . ." *Id.* at 542, 993 A.2d at 639.

While the majority accurately states the purpose of the DNA Collection Act [7] and the holding of *Raines,* 383 Md. at 5,

---

7. Maryland Code (2003) Section 2–505(b) of the Public Safety Article provides:

"(1) Only DNA records that directly relate to the identification of individuals shall be collected and stored.

"(2) DNA records may not be used for any purposes other than those specified in this subtitle."

857 A.2d at 21, the case that upheld the statute in the face of challenge, its reliance on the statute and *Raines* is misplaced. The DNA Collection Act expressly authorizes the collection and storage of DNA samples, but it applies only under the circumstances prescribed and to the persons enumerated:[8] to convicted felons, and those convicted of violations of Maryland Code (2002) § 6–205 or § 6–206 of the Criminal Law Article.[9]

---

**8.** Maryland Code (2003) Section 2–504 of the Public Safety Article provides:

"Collection of DNA samples:

"(a) In general.—

"(1) In accordance with regulations adopted under this subtitle, and if adequate funds for the collection of DNA samples are appropriated in the State budget, an individual who is convicted of a felony or a violation of § 6–205 or § 6–206 of the Criminal Law Article shall:

"(i) have a DNA sample collected on intake to a correctional facility, if the individual is sentenced to a term of imprisonment; or

"(ii) provide a DNA sample as a condition of sentence or probation, if the individual is not sentenced to a term of imprisonment.

"(2) If adequate funds for the collection of DNA samples are appropriated in the State budget, an individual who was convicted of a felony or a violation of § 6–205 or § 6–206 of the Criminal Law Article on or before October 1, 2003 and who remains confined in a correctional facility on or after October 1, 1999, shall submit a DNA sample to the Department.

"(b) Place of collection.—In accordance with regulations adopted under this subtitle, each DNA sample required to be collected under this section shall be collected:

"(1) at the correctional facility where the individual is confined, if the individual is confined in a correctional facility on or after October 1, 2003, or is sentenced to a term of imprisonment on or after October 1, 2003; or

"(2) at a facility specified by the Director, if the individual is on probation or is not sentenced to a term of imprisonment.

"(c) Authorized collectors.—A DNA sample shall be collected by an individual who is:

"(1) appointed by the Director; and

"(2) trained in the collection procedures that the Crime Laboratory uses.

"(d) Second DNA sample.—A second DNA sample shall be taken if needed to obtain sufficient DNA for the statewide DNA data base or if ordered by the court for good cause shown.

"(e) Failure to provide DNA sample.—Failure of an individual who is not sentenced to a term of imprisonment to provide a DNA sample within 90 days after notice by the Director is a violation of probation."

**9.** Maryland Code (2002) Section 6–205 of the Criminal Law Article provides:

*Raines* does not expand the reach or the applicability of the statute.

Neither the DNA Collection Act nor *Raines* has applicability to the DNA collection or, for that matter, to the defendant in this case. Indeed, there is no statute which covers the situation presented in this case. Moreover, the police actions do not fall under any provision found in the Act. Williamson had not been convicted of a felony or a violation of either § 6–205, misdemeanor burglary in the fourth degree, or § 6–206, misdemeanor breaking and entering a motor vehicle, under the circumstances enumerated by the Act. And, of course, none of the "protections" for a defendant was observed. In

---

"Burglary in the fourth degree
 (a) Prohibited—Breaking and entering dwelling.—A person may not break and enter the dwelling of another.
 (b) Same—Breaking and entering storehouse.—A person may not break and enter the storehouse of another.
 "(c) Same—Being in or on dwelling, storehouse, or environs.—A person, with the intent to commit theft, may not be in or on:
 "(1) the dwelling or storehouse of another; or
 "(2) a yard, garden, or other area belonging to the dwelling or storehouse of another.
 "(d) Same—Possession of burglar's tool.—A person may not possess a burglar's tool with the intent to use or allow the use of the burglar's tool in the commission of a violation of this subtitle.
 "(e) Penalty.—A person who violates this section is guilty of the misdemeanor of burglary in the fourth degree and on conviction is subject to imprisonment not exceeding 3 years.
 "(f) Conviction of theft.—A person who is convicted of violating § 7–104 of this article may not also be convicted of violating subsection (c) of this section based on the act establishing the violation of § 7–104 of this article."
Section 6–206 of the Criminal Law Article provides:
"Breaking and entering motor vehicle—Rogue and vagabond
 "(a) Prohibited—Possession of burglar's tool.—A person may not possess a burglar's tool with the intent to use or allow the use of the burglar's tool in the commission of a crime involving the breaking and entering of a motor vehicle.
 "(b) Same—Presence in another's vehicle.—A person may not be in or on the motor vehicle of another with the intent to commit theft of the motor vehicle or property that is in the motor vehicle.
 "(c) Penalty.—A person who violates this section is guilty of a misdemeanor, shall be considered a rogue and vagabond, and on conviction is subject to imprisonment not exceeding 3 years."

short, the DNA was not, I reiterate, collected pursuant to the Act, as upheld in *Raines.*

I do not agree that DNA analysis, whether done pursuant to the Maryland DNA Collection Act or pursuant to some other authority is akin to fingerprint analysis. A fingerprint is an impression "left by the depositing of oil upon contact between a surface and the friction ridges of fingers." *United States v. Mitchell,* 365 F.3d at 221; *see United States v. Mitchell,* No. 2:09cr105, 2009 U.S. Dist. Lexis 103575, at \*29 (W.D.Pa. Nov. 6, 2009) (making the point, after observing that "[f]ingerprints, . . . only identify the person who left them," while DNA typing may not, positing the case of Monozygotic twins, that "[t]he extraction of DNA . . . is much more than a mere progression of taking fingerprints and photographs, it represents a quantum leap that is entirely unnecessary for identification purposes. The only reasonable use of DNA is investigative, it is not an identification science it is an information science."). The description in *Mitchell,* 365 F.3d at 221–22, of how the FBI conducts its fingerprinting analysis is instructive:

> "The FBI . . . uses an identification method known as ACEV, an acronym for 'analysis, comparison, evaluation, and verification.' The basic steps taken by an examiner under this protocol are first to winnow the field of candidate matching prints by using Level 1 detail[10] to classify the latent print. Next, the examiner will analyze the latent print to identify Level 2 detail[11] (i.e., Galton points and their spatial relationship to one another), along with any Level 3 detail[12] that can be gleaned from the print. The examiner them compares this to the Level 2 and Level 3 detail of a candidate full-rolled print (sometimes taken from

---

**10.** "Level 1 detail is visible with the naked eye; it is the familiar pattern of loops, arches, and whorls." *Mitchell,* 365 F.3d at 221.

**11.** "Level 2 detail involves 'ridge characteristics'—the patterns of island, dots, and forks formed by the ridges as they begin and end and join and divide." *Mitchell,* 365 F.3d at 221.

**12.** "Level 3 detail focuses on microscopic variations in the ridges themselves." *Mitchell,* 365 F.3d at 221.

a database of fingerprints, sometimes taken from a suspect in custody), and evaluates whether there is sufficient similarity to declare a match."

That is not the case when conducting a DNA analysis. There is an additional step: with DNA, the cells found on the cup first must be "chemically broken so that [Williamson's DNA could] be collected." Then, technology, more sophisticated than fingerprint analysis, is used to analyze the DNA in order to create a DNA record, a profile, capable of, and for, comparison with other profiles. With fingerprinting, the lifting is all that is required for comparison of the latent fingerprint to those in a database.

To be sure, the comparison feature for purposes of identification is similar for fingerprints and DNA. Nevertheless, merely because DNA records are, at some point, capable of being uploaded and compared for the purpose of identification and its use can be limited to that purpose, does not mean that a warrant is not required for the initial analysis. It is what is done prior to the creation of the DNA profile, the analysis, which is the invasion, for without this invasion there would be no other invasion, as there would be no profile for the police to compare in its database of profiles.

Fingerprint analysis and DNA analysis, in fact, are not akin to each other. DNA analysis involves more than just collection of DNA, the testing of the sample collected is a significant invasion, a search, it has been held. *State v. Martin,* 184 Vt. 23, 955 A.2d 1144, 1151 (2008) ("The initial taking of the DNA sample, either by blood drawn or by buccal swab, and the subsequent analysis, storage, and searching of the DNA profile are *independent* intrusions upon personal security that merit scrutiny under Article 11.")[13] (emphasis added). The

---

**13.** Article 11 of the Vermont Constitution provides: "that the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or

DNA Collection Act also recognizes that this is so. Maryland Code (2003, Supp.2009) Section 2–504(d) of the Public Safety Article, DNA Collection Act currently provides:

"(d) Testing of sample from individual charged with crime under subsection (a)(3).—

"(1) A DNA sample collected from an individual charged with a crime under subsection (a)(3) of this section may

---

their property, not particularly described, are contrary to that right, and ought not to be granted." Vt. Const. Ch. I. Art. 11. Vermont's Chapter I, Article 11 is " 'similar in purpose and effect' to the Fourth Amendment to the United States Constitution." *State v. Martin*, 184 Vt. 23, 955 A.2d 1144, 1148 (2008).

Although decided in the context of a challenge to the constitutionality of the DNA Analysis Backlog Elimination Act of 2000, two decisions of the United States District Court for the District of Massachusetts, *United States v. Stewart*, 468 F.Supp.2d 261, 265, 282 (D.Mass.2007), *rev'd*, 532 F.3d 32 (1st Cir.2008) and *United States v. Weikert*, 421 F.Supp.2d 259, 266 (D.Mass.2006) *rev'd*, 504 F.3d 1 (1st Cir.2007), addressing the nature of the intrusion caused by the collection and analysis of DNA, deserve mention. Both courts held that the analysis of DNA was far more invasive than retrieving the DNA sample from the person. Relying on *Weikert*, 421 F.Supp.2d at 266, the *Stewart* court explained:

"[The] chemical analysis of [ ]DNA presents an even greater intrusion. As Judge Keeton held in *United States v. Weikert*, 'the later analysis and identifying information that is then stored in CODIS are likely much more of an invasion of an individual's privacy than the initial blood test.' This second intrusion is generally downplayed by courts that have upheld this search regime. It is this second intrusion that contains information about one's genetic make-up and physiological data discussed above. This intrusion had a physical predicate that is brief, yet it is expansive in scope and breadth regarding the private information revealed. The degree of information available from DNA distinguishes this intrusion from the limited nature of a fingerprint search that cannot reveal anything other than identifying marks."

468 F.Supp.2d at 277–78. (internal citations omitted).

To be sure, the First Circuit Court of Appeals reversed the ruling of both courts that the Act was unconstitutional. That Court did not, however, reject its analysis on this point; rather, in the context of the statute, in particular, its limits on the use of the DNA data, it "concluded that the risk of misuse of the DNA information stored in CODIS did not 'significantly increase' the conditional releasee's privacy interest because the DNA Act includes significant criminal penalties for such abuse and because the 'junk DNA' that is collected currently poses little risk of abuse." *United States v. Stewart*, 532 F.3d at 35, quoting *United States v. Weikert*, 504 F.3d at 12–13.

not be tested or placed in the statewide DNA data base system prior to the first scheduled arraignment date unless requested or consented to by the individual as provided in paragraph (3) of this subsection.

"(2) If all qualifying criminal charges are determined to be unsupported by probable cause:

"(i) the DNA sample shall be immediately destroyed; and

"(ii) notice shall be sent to the defendant and counsel of record for the defendant that the sample was destroyed."

The placement of the test results in the database for comparison with other DNA profiles is another. There are two searches.

The technology that permits the analysis of DNA to create a profile for identification purposes, in addition and at the same time, creates a DNA record that is capable of revealing extensive personal information. I have addressed this issue before:

"Although the intrusion of a buccal swab may be minimal in a physical sense, it certainly is great when the vast amount of personal and private information DNA contains is considered. As we recently explained:

'While the DNA profile is often referred to as a type of genetic 'fingerprint,' this analogy is far too simplistic. Although current profiling methods utilize only limited amounts of genetic information, with the mapping of the human genome now underway, future DNA analysis may soon reveal an individual's medical history; proclivity toward certain diseases; and hereditary information such as race, physical, and behavioral traits. Thus, biological samples . . . have the potential to reveal far more intimate information about the individual donor than a single fingerprint. . . . Unlike an individual's fingerprint, which use is limited to identification, [because a person's fingerprint can only identify a person] information potentially contained in a DNA profile may subject an individual to

embarrassment, humiliation, public hostility, and even financial harm."

\* \* \* \*

"Unlike fingerprints, which contain all of the useable identifying information at the time the prints are taken, the DNA search does not end with the swab. To the contrary, the swab is then subjected to scientific tests, which may extract very sensitive, personal, and potentially humiliating information."

*State v. Raines*, 383 Md. at 73–74, 857 A.2d at 62–63 (Bell, C.J., dissenting); *see also United States v. Kincade*, 379 F.3d 813, 842 n. 3 (9th Cir.2004) ("[U]nlike fingerprints, DNA stores and reveals massive amounts of personal, private data about that individual, and the advance of science promises to make stored DNA only more revealing in time. Like DNA, a fingerprint identifies a person, but unlike DNA, a fingerprint says nothing about the person's health, their propensity for particular disease, their race and gender characteristics, and perhaps even their propensity for certain conduct.").

The majority also rejects the applicability of *United States v. Mitchell*, 2009 U.S. Dist. Lexis 103575 (W.D.Pa. Nov. 6, 2009) and *United States v. Amerson*, 483 F.3d 73 (2d Cir. 2007), cases on which Williamson relies to support his Fourth Amendment claim. *Williamson*, 413 Md. at 540–41, 993 A.2d at 638. It reasons, accurately characterizing the context of the litigation: "The analysis in *Mitchell* and *Amerson* . . . of the constitutionality of the federal statutes requiring a pretrial detainee or a convicted felon to submit a DNA sample, is completely inapplicable to the case at bar in which we determine abandonment and lawful collection of DNA." *Williamson*, 413 Md. at 541, 993 A.2d at 638. The majority concludes: "Had the police compelled Williamson to give a DNA sample as a pretrial detainee, Williamson's argument [that the search required a warrant] may have had some weight. Williamson, however, was not compelled to give his DNA. . . ." *Williamson*, 413 Md. at 540, 993 A.2d at 637.

I take the majority's point. This case is not about the constitutionality of the Maryland DNA Collection statute, that was decided by *Raines, supra,* or, for that matter, any statute. Indeed, the Maryland statute is not at issue *sub judice.* What is at issue is whether the extraction or collection of DNA from the beverage cup, the analysis of that DNA and the subsequent uploading and comparison of the result of the analysis, or any step in the process, constitutes a search to which the Fourth Amendment applies. Informing that determination is the nature and significance of the intrusion that any one or more of those steps has on the individual's privacy interest. Both of these concerns were germane to the issue that *Mitchell* and *Amerson* addressed. Both of those cases recognized that, even under the statute, the collection of the DNA from the person, in the manner prescribed, either by drawing blood, or by use of a buccal swab, is a search "subject to Fourth Amendment scrutiny," *Mitchell,* 2009 U.S. Dist. Lexis 103575, at *3–4, *citing,* respectively, *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639, 659 (1989) and *Padgett v. Donald,* 401 F.3d 1273, 1277 (11th Cir.2005); see also *Amerson,* 483 F.3d at 84, *citing Nicholas v. Goord,* 430 F.3d 652 (2d Cir.2005), as is the " 'ensuing chemical analysis of the sample to obtain physiological data.' " *Mitchell,* 2009 U.S. Dist. Lexis 103575, at *4, *quoting Skinner,* 489 U.S. at 616, 109 S.Ct. at 1413, 103 L.Ed.2d at 659; *Amerson,* 483 F.3d at 77.

*Mitchell* and *Amerson* also recognized that a pretrial detainee, who has a lesser liberty interest than an " 'ordinary citizen,' " *Mitchell,* 2009 U.S. Dist. Lexis 103575, at *30, retains an expectation of privacy in the information contained in his or her DNA and, therefore, characterized the analysis, comparison and storage, if not the extraction or collection, of that DNA, as intrusive. Acknowledging "his restricted liberty as a pretrial detainee," the Mitchell court noted, nevertheless, that it

"has found that he maintains a high expectation of privacy in the comprehensive, inherently private information contained in his DNA sample. Therefore, even though the

taking of a sample may not be unreasonably intrusive, the search of the sample is quite intrusive, severely affecting Mitchell's expectation of privacy in his most intimate matters."

*Id.* Although concluding that "[t]he Act severely limits the circumstances and purposes for which the DNA profiles can be released and provides significant penalties for any misuse of the DNA samples or profiles," *Amerson,* 483 F.3d at 85, and satisfied that "the federal statute provides adequate safeguards to insure that the privacy invasion occasioned by the maintenance of the DNA profiles is minimized," *id.,* the court in *Amerson* characterized the "analysis and maintenance of [offenders'] information' in CODIS, the federal database" a "serious invasion of privacy" and "a significant intrusion." *Id., citing Nicholas,* 430 F.3d at 670.

These pronouncements are not simply germane to the issue before this Court, they apply with greater force. Indeed, it is precisely for the reason that no statute now regulates the collection of DNA under the circumstances of this case or, at the time, regulated it, that these considerations are dispositive.

## IV

It is not surprising that the majority has chosen to categorize the issue presented by this case as one involving, and, therefore, to address it utilizing, the doctrine of abandonment. It is an easy and simple, even simplistic, approach and solution to a most complex problem. This approach permits the majority to avoid addressing the balance required to be struck when determining whether an individual's expectation of privacy in his or her DNA is entitled to Fourth Amendment protection, the very heart of which implicates "the reasonableness requirement of the Fourth Amendment." [14] To be sure,

---

14. I do not doubt that, based upon the record, probable cause would have existed, even if Detective Morgan did not use a ruse in order to retrieve Williamson DNA from a McDonald's beverage cup. Well before the police decided to use its ruse, it was aware of the DNA match

Williamson left, as trash—abandoned—a cup from which he had drunk and which, therefore, retained his DNA. The DNA, in the form that it can and will be extracted or collected from the cup, however, is virtually meaningless—it provides no information to the untrained or the uninitiated; meaningful information, capable of identifying Williamson and of being compared to other identifying information, must await and only can be obtained through the use of sophisticated technology. The question is, given the Fourth Amendment's applicability to privacy interests, under that Amendment, may the State—not a private person, who is unrestrained by constitutional restrictions—without the authorization of a warrant, go beyond seizure of the cup and extraction from it of data it contains and conduct an analysis of that data and subsequently a comparison of the results with other data it has amassed? The answer must be no.

The Supreme Court has stated that "what a person knowingly exposes to the public, even in his own home or office, is not subject of Fourth Amendment protection. But what he seeks to preserve as private, even in the area accessible to the public, may be constitutionally protected." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576, 582 (1967) (citations omitted). It also has held that a search that goes "beyond mere 'physical characteristics . . . constantly exposed to the public . . . constitute[s] the type of severe' . . . intrusion upon cherished personal security that is subject to constitutional scrutiny" *Cupp*, 412 U.S. at 295, 93 S.Ct. at 2003, 36 L.Ed.2d at 905(internal citation and quotation marks

---

between the 1994 assailant and the 2002 assailant. It was also known, that Williamson entered an *Alford* plea for the 1994 incident, in which he admitted to having sexual intercourse with the victim. This alone, may have been sufficient evidence for a neutral and detached magistrate to find probable cause and issue a search warrant. It would be a mere assumption to conclude that the magistrate found probable cause on the 1994 and 2002 match alone, for the application for a warrant asserted that probable cause existed because of both the 1994 and 2002 match and the match between the DNA retrieved from Williamson's cup and the 2002 match.

omitted). These pronouncements have relevance in the abandonment context.

If the majority is correct, there would be no reason, or need, for DNA collection statutes. The State could do as it did here, supply the cup and instead of disposing of it, analyze the DNA on it. A lot of constitutional questions and litigation could thereby be avoided.

I dissent.

Judge GREENE joins in the views herein expressed.