*97 ADKINS, J.,
dissenting, in which HARRELL and GREENE, JJ., join.
Most respectfully, I dissent. The Majority holding represents a significant extension of the State’s right to invade private rights of individuals in their DNA beyond that authorized by the Supreme Court’s decision in Maryland v. King, 569 U.S. -, 133 S.Ct. 1958, 186 L.Ed.2d 1 (2013). The result of the Majority opinion is that, short of searching a person via touch or entering her home, the State may collect any person’s DNA, create a genetic profile, and add it to the CODIS database,[1] all without implicating, let alone respecting, any constitutional protection. The State may do this regardless of the legal status of the person. In my view, this holding is unfounded, and a warrantless search of a free citizen’s[2] DNA against his will should be considered unreasonable and a violation of the Fourth Amendment.
The Fourth Amendment guarantees that “[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]” U.S. Const, amend. IV. An unbiased magistrate may grant a warrant to search and seize based upon probable cause. See id. If there were probable cause for Raynor’s arrest, the police could have obtained Raynor’s DNA by following normal booking procedures.[3] The State could *98 also have obtained his DNA if he were already a parolee, a probationer, or incarcerated.[4]
A warrantless search, however, must be submitted to the test of reasonableness by balancing legitimate government interests with a person’s privacy expectation. “The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined ‘by assessing, on the one hand, the degree to which it intrudes upon an individual’s privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.’ ” United States v. Knights, 584 U.S. 112, 118-19, 122 S.Ct. 587, 591, 151 L.Ed.2d 497, 505 (2001) (quoting Wyoming v. Houghton, 526 U.S. 295, 300, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408, 414 (1999)). The controlling modern test to establish whether a person has a privacy interest entitled to protection under the Fourth Amendment was penned by Justice Harlan in his concurrence in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Justice Harlan set forth a two-part test: (1) that the person exhibits an actual, subjective expectation of privacy; and (2) that society is prepared to recognize the privacy interest as “reasonable.” Id. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587-88.
As I see it, two distinct events happened in this case that raise Fourth Amendment concerns. The first is the State’s collection of Raynor’s DNA from the police station chair after inviting him to the station for questioning, at which time he refused to submit to DNA testing. The second is the analysis and submission to the CODIS database of the DNA. Here, the Majority neatly disregards the first step, relying on counsel’s words at oral argument as a deemed “concession” from Ray- *99 nor that the police acquired his DNA legally. In doing so, the Majority lifts these events from their real-life context, and places them in a more palatable milieu—comparing them to fingerprints the police happen to find in some public place. This short-cut by the Majority avoids addressing the crucial issue of whether police can legally “invite” free citizens into the station for questioning, with the intended purpose of surreptitiously collecting their DNA for analysis and submission to CODIS, and effectuate that collection against their express refusal.

King And The DNA Collection Act

As Knights instructs us, we must weigh the government’s interest against that of the individual. To support its claim to a strong governmental interest in Raynor’s DNA, the State proffers a body of case law, and state interests identified therein, which applies only in the context of an arrest. Most, if not all, of these cases were decided under the DNA Collection Act. Md.Code (2003, 2011 Repl.Vol., 2013 Supp.), § 2-501 et seq. of the Public Safety Article (“PS”).[5] This Act, which the police relied upon in King, mandates collection of DNA from all persons arrested for certain crimes and contains clear restrictions on use of that DNA. PS §§ 2-504(a)(3); 2-505(b)(2). Not only does it restrict such collection to those arrested, but it also requires that the DNA be removed from the database if the person is not convicted.[6] The Act also restricts use of the DNA strictly to “records that directly relate to the identification of individuals^]” PS § 2—505(b)(1). Significantly, there is no statute authorizing such police action against persons who are not under arrest.
Unlike Mr. King, undisputedly, Raynor was not arrested and therefore was not subject to the DNA Collection Act. Thus, in examining Raynor’s rights, we deal with a different paradigm, involving rules markedly distinct from those appli *100 cable in Maryland v. King, Williamson v. State, 413 Md. 521, 993 A.2d 626 (2010), and similar cases. As explained below, arrestees are a class of persons with a diminished expectation of privacy. The DNA Collection Act depends on this diminished expectation of privacy in mandating collection of an arrestee’s DNA.
Unlike its lesser interest in free citizens, who possess the full panoply of constitutional rights, the State has considerably weighty interests in learning the true identity of an arrestee. The King Court enumerated five state interests advanced by the DNA Collection Act: first, the need to identify “who is being tried”; second, the need to ensure the detainee does not create “inordinate ‘risks for facility staff ”; third, the need to ensure persons are available for trial; fourth, the need to determine the threat posed to society (by finding if the arrestee committed other crimes); and fifth, the possibility of freeing an innocent man wrongfully imprisoned in his stead. King, 569 U.S. at -, 133 S.Ct. at 1971-74, 186 L.Ed.2d at 22-24 (citations omitted). Not one of those interests applies to Raynor.
By endorsing the police action in this case against a free citizen, the Majority opinion considerably extends the King holding beyond the boundary of what should be considered constitutional.[7] The limited scope of the Supreme Court’s *101 holding in King is revealed in the High Court’s concluding paragraph:
In light of the context of a valid arrest supported by probable cause respondent’s expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks. By contrast, that same context of arrest gives rise to significant state interests in identifying respondent not only so that the proper name can be attached to his charges but also so that the criminal justice system can make informed decisions concerning pretrial custody. Upon these considerations the Court concludes that DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure. When officers make an arrest supported by probable cause to hold for a serious offense and they bring the suspect to the station to be detained in custody, taking and analyzing a cheek swab of the arrestee’s DNA is, like fingerprinting and photographing, a legitimate police booking procedure that is reasonable under the Fourth Amendment.
569 U.S. at -, 133 S.Ct. at 1980, 186 L.Ed.2d at 32. The High Court expressed no intent to authorize police, in their unfettered discretion, to invite free citizens to police stations, collect their DNA when they leave, test the DNA to create a profile, and submit the visitor’s profile to the CODIS Database, all against the free citizen’s wishes.
As I see it, here, the police conducted one search by collecting Raynor’s DNA from the chair, and a second search when they tested it to create a profile. See, e.g., United States v. Amerson, 483 F.3d 73, 85 (2d Cir.2007) (“There is, however, a second and potentially much more serious invasion of privacy occasioned by the DNA Act. As we recognized in Nicholas, *102 the ‘analysis and maintenance of [offenders’] information’ in CODIS, the federal database is, in itself, a significant intrusion. We are mindful of the vast amount of sensitive information that can be mined from a person’s DNA and the very strong privacy interests that all individuals have in this information.” (quoting Nicholas v. Goord, 430 F.3d 652, 670 (2d Cir.2005))); see also Mario W. v. Kaipio, 230 Ariz. 122, 128, 281 P.3d 476, 482 (Ariz.2012) (“This second search presents a greater privacy concern than the buccal swab because it involves the extraction (and subsequent publication to law enforcement nationwide) of thirteen genetic markers from the arrestee’s DNA sample that create a DNA profile effectively unique to that individual.”). Alternatively, these two searches may be seen as two parts of a single search.
Without an authorizing statute with defined limitations on use of the DNA, under the Majority opinion, the police have unfettered choice as to who to bring into the station for non-permissive DNA collection and testing, thus allowing for arbitrary decisions. Without the restrictions of the DNA Collection Act, the State also has the ability to retain a private citizen’s DNA, to be mined in future years, for whatever purposes it desires. See Amerson, 483 F.3d at 85; United States v. Kincade, 379 F.3d 813, 843 (9th Cir.2004) (Reinhardt, J., dissenting) (“[A]ll Americans will be at risk, sooner rather than later, of having our DNA samples permanently placed on file in federal cyberspace, and perhaps even worse, of being subjected to various other governmental programs providing for suspicionless searches conducted for law enforcement purposes.”).
The Supreme Court in King emphasized that the DNA Collection Act mandated that DNA be collected from all persons arrested for certain crimes, and the Court considered it material that the officers had no discretion to decide whose DNA would be taken. See King, 569 U.S. at -, 133 S.Ct. at 1969-70, 186 L.Ed.2d at 20-21. In all of the DNA collection cases discussed by the parties, the government’s right to collect the DNA hinged on the individual being part of a diminished status group, such as an arrestee. See, e.g., King, *103 569 U.S. -, 133 S.Ct. 1958, 186 L.Ed.2d 1 (arrestee); United States v. Mitchell, 652 F.3d 387 (3d Cir.2011) (arrestee); Williamson, 413 Md. 521, 993 A.2d 626 (2010) (arrestee); State v. Raines, 383 Md. 1, 857 A.2d 19 (2004) (incarcerated person). As I indicated, in each of these cases, the primary government interest was only established once the person became a detainee or arrestee. Here, that critical linchpin is glaringly absent.

Nature Of Privacy Interest In DNA And Supreme Court Protection Of Privacy

The privacy interest Raynor sought to protect, his DNA, is immensely personal and private, and deserves the staunchest protection under the Fourth Amendment. DNA has the potential to reveal enormous amounts of private information about a person. With today’s technology, scientists have the power to discern genetic traits, behavioral tendencies, propensity to suffer disease or delects, other private medical information, and possibly more. Williamson, 413 Md. at 564, 993 A.2d at 652.[8] Cf. Skinner v. Ry. Labor Execs. Ass’n, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639, 659 (1989) (“It is not disputed, however, that chemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee, including whether he or she is epileptic, pregnant, or diabetic.”). Raynor explicitly refused police acquisition of his DNA, and such assertion of his privacy right deserved protection. His presence at the station and his objection also distinguish the police action here from police finding DNA of some unidentified person, which has some connection to a crime being investigated. The Majority, though, in refusing to treat the collection of Raynor’s DNA from the chair as a search for Fourth Amendment purposes *104 based on counsel’s “concession,” turns a blind eye to this important consideration.
The Supreme Court has repeatedly recognized the existence of privacy protection outside of the Fourth Amendment context, particularly bodily privacy and the right of a person to control information about himself and intimate aspects of life. See Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (striking down law against sodomy between consenting adults on privacy grounds); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (constitutional right of privacy encompasses decision involving termination of pregnancy); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (constitutional right of privacy in use of contraceptives). If a warrant is required for the police to see the personal intimate details kept secured in one’s home,[9] then logically a warrant is required to seize the same private information locked inside of an individual. See Stephanie B. Noronha, Comment, Maryland v. King: Sacrificing the Fourth Amendment to Build Up the DNA Database, 73 Md. L.Rev. 667, 685 (2014) (arguing that the reasoning in King “begs the question: why is it that the Court finds privacy, secrecy, and autonomy within the four walls of the home paramount, but does not hold intrusion into the human body to as high of a standard?” (Footnote omitted)).

Recent Federal Cases On Privacy Rights Even Without Physical Invasion

The ongoing debate regarding cloud technology and collecting intangible data depicts the tremendous intrusions that can occur without a physical invasion. In its decision in United States v. Davis, 690 F.3d 226, 231 (4th Cir.2012), the Fourth Circuit warned of police trampling on an individual’s Fourth Amendment rights when the police collected a DNA sample from the defendant’s pants and created a profile without *105 probable cause, resulting in an unreasonable search. The court reasoned that the absence of a judicial officer to approve or deny the use of an individual’s DNA accords police an unchecked power that can be exercised arbitrarily. See id. at 249-50.
Less than three months ago, in a case involving a different Mr. Davis, the Eleventh Circuit held that the government’s collection of electronic location information from the defendant’s cell phone service provider, without probable cause, resulted in a violation of the defendant’s Fourth Amendment protections. See United States v. Davis, 754 F.3d 1205, 1216-17 (11th Cir.2014). The Eleventh Circuit rejected the government’s abandonment and lack of physical intrusiveness justifications, agreeing with the proposition that when a cell phone user receives a call, he does not voluntarily expose anything, even though the location of his cell phone is automatically traced. Id. at 1217. The dual Davis cases support the notion that an individual’s informational privacy should be protected by the Fourth Amendment, even without physical intrusion.
More importantly, the Supreme Court, on June 25, 2014, issued its unanimous decision in Riley v. California, holding that, even after a lawful arrest, the police could not seize data from a cell phone in the arrestee’s possession without a warrant because of the wealth of personal and private information stored there, including calls made and received. — U.S. -, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014). As Chief Justice Roberts wrote for the Court: “[a]n Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual’s private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD.” — U.S. at -, 134 S.Ct. at 2490, 189 L.Ed.2d at -. Thus, the Supreme Court has taken another important step in recognition of privacy in personal information not tied to a physical intrusion.

Flaws In Majority’s Reasoning

The Majority opinion discounts the large amounts of highly personal details that DNA reveals on grounds that here, the *106 State only used the DNA profile for identification. As I indicated earlier, the Majority also sidesteps Raynor’s claim for protection of his privacy interests by seizing upon a “concession” that defense counsel made during oral argument. The Majority’s logic goes like this: (i) defense counsel at oral argument said it was “okay” for police to take the DNA off the chair in the police station, objecting only to the scientific testing; (ii) the police therefore legitimately took possession of the DNA without, a search; and (in) the only testing the police performed was of the junk DNA for purposes of identification. Maj. Op. at 81-82, 84-86, 99 A.3d at 758-59, 760-61.
This reasoning is flawed in several respects. First, we should not decide important constitutional issues based on a statement made by counsel at oral argument. Unlike matters of fact, we are not bound by counsels’ stipulations regarding legal principles. As the Kentucky Supreme Court said, “[stipulations of the parties will not be allowed to determine the decision of the court on matters involving constitutional or statutory construction or other matters of public interest.” Com. ex rel. Breckinridge v. Nunn, 452 S.W.2d 381, 382 (Ky.1970). Second, the police did not test Raynor’s DNA for identification because they already knew full well who he was. And, because they were not arresting Raynor, none of the State’s interests in safety and other concerns attendant to the identity of incarcerated persons arose. Third, DNA collection and testing is still in its infancy stage, and technology is constantly improving. Thus, it is not unreasonable to believe that the government’s capacity for obtaining useful information from “junk” DNA will expand significantly, and will involve the discovery of enlarged personal details in the future.[10] As there is no statute placing limits on either the *107 length of time the DNA may be retained or the uses to which it may be put, the State is free to test the DNA using scientific techniques we can only imagine today.
The Majority’s limited-use-of-information rationale is also inconsistent with the Supreme Court’s rulings in Kyllo v. United States[11] and Skinner v. Railway Labor Executives’ Association.[12] In those cases, the mere potential for intrusion on information created an expectation of privacy. Kyllo v. United States, 533 U.S. 27, 38, 121 S.Ct. 2038, 2045, 150 L.Ed.2d 94, 104 (2001) (“Limiting the prohibition of thermal imaging to ‘intimate details’ would not only be wrong in principle; it would be impractical in application, failing to provide ‘a workable accommodation between the needs of law enforcement and the interests protected by the Fourth Amendment^]’ ” (citation omitted)); Skinner, 489 U.S. at 617, 109 S.Ct. at 1413, 103 L.Ed.2d. at 659 (“It is not disputed, however, that chemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee, including whether he or she is epileptic, pregnant, or diabet *108 ic.”). See also Albert E. Scherr, Genetic Privacy & the Fourth Amendment: Unregulated Surreptitious DNA Harvesting, 47 Ga. L.Rev. 445, 471 (2013).
The lack of physical intrusion should not resolve the question of whether there was a search. The Supreme Court has repeatedly held that an intrusion and a violation of the Fourth Amendment can occur without crossing physical boundaries. See Kyllo, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (thermal imaging); Katz, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (wiretap). Justice Harlan’s test moves away from strict property-rights interests, and Katz rejected the need for trespass, holding that a Fourth Amendment violation can occur by violating a person’s privacy without physical intrusion. See Katz, 389 U.S. at 353, 88 S.Ct. at 512, 19 L.Ed.2d at 583. In light of today’s cutting-edge technology, under the circumstances here, gathering Raynor’s DNA, testing to create a profile, and submitting it to the CODIS database should not be considered as any less intrusive a search and seizure than that which results from a cheek swab. The practical result is the same and it should be seen for what it is: a significant search into the body and permanent seizure of a person’s private information.[13]
The Majority’s approval of such police procedure means, in essence, that a person desiring to keep her DNA profile private, must conduct her public affairs in a hermetically-sealed hazmat suit.[14] Moreover, the Majority opinion will likely *109 have the consequence that many people will be reluctant to go to the police station to voluntarily provide information about crimes for fear that they, too, will be added to the CODIS database.
The State argues that any DNA shed in any public area is unprotected, an averment that goes too far. The Fourth Amendment protects what a person “seeks to preserve as private, even in an area accessible to the public.” Katz, 389 U.S. at 351, 88 S.Ct. at 511, 19 L.Ed.2d at 582. In United States v. Davis, the Eleventh Circuit declared that the defendant had “not voluntarily disclosed his cell site location information to the provider in such a fashion as to lose his reasonable expectation of privacy.” 754 F.3d at 1217. I strongly submit that a person’s DNA deserves at least as much protection as one’s whereabouts based on cell phone data. The State concedes that Raynor did not volitionally leave his DNA on the arms of the chair in the police station. Therefore, he still retains an expectation of privacy in his intimate and personal genetic make-up.[15]

A New Approach For DNA

Raynor’s counsel argues that the Fourth Amendment requires a new approach that takes into account the advanced technology that allows collection and harvesting without invasion, and recent knowledge that we shed DNA everywhere we go throughout each day. I agree and propose that we treat the zone of privacy not in terms of Raynor’s physical DNA in the form of saliva or sweat, but his expectation of privacy from exposure of the results of scientific tests performed on his DNA.
*110 Conclusion
The State concedes that Raynor was not an actual suspect at the time his DNA was taken and tested, because the one piece of information that caused police to ask him to come to the station was the rape victim’s claim, two years after the crime, that she had a hunch he may have been involved. This occurred after she had previously identified 22 other persons, whom the police interviewed as “persons of interest.” Moreover, Raynor refused to give a DNA sample, and specifically said that he did not wish to be in the CODIS database. Under these circumstances, the balance of the Katz reasonableness test shifts dramatically. Here, the State lacks the weighty government interests that were present in King and earlier cases. Such interests arise when the police possess probable cause to make an arrest and take a person into custody, thus diminishing the person’s expectation of privacy.
On the other hand, Raynor’s expectation of privacy in his DNA deserves the utmost protection because he was a free citizen at the time of police questioning. The defining traits of DNA illustrate dignitary, informational, and personal characteristics that the Supreme Court has come to protect in other contexts, even without physical intrusion. There was a search here, and it was an unreasonable one that violated Raynor’s Fourth Amendment Constitutional rights. I would reverse the judgment of the Court of Special Appeals, and remand the case to that court with direction to reverse the judgment of the Circuit Court of Harford County and direct the court to grant Raynor’s motion to suppress.
Judges HARRELL and GREENE authorize me to state that they join the views expressed in this dissent.

. According to Md.Code (2003, 2011 Repl.VoL, 2013 Supp.), § 2-501(c) of the Public Safety Article ("PS”):
(1) "CODIS” means the Federal Bureau of Investigation's "Combined DNA Index System” that allows the storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories.
(2) “CODIS” includes the national DNA index administered and operated by the Federal Bureau of Investigation.

. By “free citizen” I mean a person who has not been arrested or detained on the basis of probable cause or reasonable suspicion. I include in this category persons who are not United States citizens, but who reside here legally.

. The victim had identified for the police anyone with whom she had contact who might be a suspect. Approximately 23 persons consented to having their DNA swabbed, but Raynor did not. As the Majority did *98 not rest its opinion on the existence of probable cause for Raynor’s arrest, and the State concedes Raynor was not under arrest, I do not address the question of probable cause.

. See Samson v. California, 547 U.S. 843, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006) (parolee); Corbin v. State, 428 Md. 488, 52 A.3d 946 (2012) (probationer); State v. Raines, 383 Md. 1, 857 A.2d 19 (2004) (incarcerated person).

. Discussed infra.

. See PS § 2-511 (requiring removal of a person’s DNA profile if she is not convicted).

. As Justice Scalia declared, "[s]olving unsolved crimes is a noble objective, but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicionless law-enforcement searches. The Fourth Amendment must prevail.” Maryland v. King, 569 U.S. -, 133 S.Ct. 1958, 1989, 186 L.Ed.2d 1, 41 (2013) (Scalia, J., dissenting); see also Skinner v. Ry. Labor Execs. Ass’n, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639, 672 (1989) (Marshall, J., dissenting) (reasoning that searches as part of the "normal need for law enforcement” are not included in the narrow category of warrantless searches). In Raines we upheld as legitimate a buccal swab of an inmate under the DNA Collection Act, and expressly distinguished two cases that failed the reasonableness test on grounds that the only government interest was general evidence-gathering:
Additionally, both [City of Indianapolis v.] Edmond[, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000)] and Ferguson [v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001)] are *101 distinguishable on their facts from the DNA collection context for two reasons. First, the Edmond and Ferguson cases involved searches of ordinary citizens without individualized suspicion, not incarcerated criminals. Second, the primary purpose of the government actions in those cases was not to identify individuals, but to gather evidence of crimes, thus acting like a general warrant.
383 Md. at 21-22, 857 A.2d. at 31.

. DNA contains “an individual's entire genome, [and thus,] tissue samples retained by the government threaten privacy interests the most, yet they receive less attention than the computer profiles contained within DNA databases.” Elizabeth E. Joh, Reclaiming “Abandoned” DNA: The Fourth Amendment and Genetic Privacy, 100 Nw. U.L.Rev. 857, 871 (2006).

. See Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (using thermal imaging device to gather information about heat in home’s interior constitutes search).

. Federal courts have recognized potential misuse as foreseeable long before Justice Scalia’s warning in Maryland v. King last year:
Although the DNA collection as currently implemented involves only junk DNA that is not associated with any known physical or mental characteristics, "new discoveries are being made by the day that challenge the core assumption underlying junk DNA’s name—regions of DNA previously thought to be junk DNA’ may be genic after all.” *107 [United States v.] Kincade, 379 F.3d [813,] 850 [(9th Cir.2004)] (Reinhardt, J., dissenting). Therefore, we agree that, “[s]hould the uses to which 'junk DNA' can be put be shown in the future to be significantly greater than the record before us today suggests, a reconsideration of the reasonableness balance struck would be necessary.” [United States v.] Amerson, 483 F.3d [73,] 85 n. 13 [(2d Cir.2007) ].
United States v. Weikert, 504 F.3d 1, 13 (1st Cir.2007); see also United States v. Davis, 657 F.Supp.2d 630, 662 (D.Md.2009) (''[T]here are significant privacy interests implicated by the maintenance of one’s DNA profile in a government database, above and beyond those implicated by the testing and comparison of one’s DNA profile to evidence from a single, specific crime. Were law enforcement permitted to include individuals’ DNA profiles in searchable databases under these circumstances, it would open ‘a backdoor to population-wide data banking.’ ” (citation omitted)).

. Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001).

. Skinner v. Ry. Labor Execs. Ass’n, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639, 660 (1989) (finding it “clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable”).

. See Skinner, 489 U.S. at 650, 109 S.Ct. at 1431, 103 L.Ed.2d at 681 (Marshall, J., dissenting) ("Only by erroneously deriding as 'minimal’ the privacy and dignity interests at stake, and by uncritically inflating the likely efficacy of the FRA's testing program, does the majority strike a different balance.”); Davis v. Mississippi, 394 U.S. 721, 728, 89 S.Ct. 1394, 1398, 22 L.Ed.2d 676, 681 (1969) (noting that fingerprinting 24 youth[s] and releasing them without charge as a tool to find a rapist was minimally intrusive, but violated their Fourth Amendment protections because it was "not authorized by a judicial officer”).

. The Majority’s holding means that a person can no longer vote, participate in a jury, or obtain a driver’s license, without opening up his genetic material for state collection and codification. Unlike DNA left in the park or a restaurant, these are all instances where the person has *109 identified himself to the government authority. All these are troubling consequences of the decision the Court makes today.

. Of course the individual’s privacy rights in his DNA must yield to the State's interests in that the State may investigate and collect and analyze DNA found at or near the scene of a crime, or on or near a weapon, or other means used to commit a crime. This does not mean, however, that outside that context, the police may gather new DNA from free citizens in an attempt to find a DNA match.